# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL ANGELO MORALES,
       *Plaintiff-Appellant,*

v.

RODERICK Q. HICKMAN, Warden,
Secretary of the California
Department of Corrections; STEVEN
W. ORNOSKI, Acting Warden, for
the California State Prison at San
Quentin,

       *Defendants-Appellees.*

No. 06-99002

D.C. Nos.
CV-06-00926-JF
CV-06-00219-JF

OPINION

Appeal from the United States District Court
for the Northern District of California
Jeremy Fogel, District Judge, Presiding

Submitted February 19, 2006*
San Francisco, California

Filed February 19, 2006

Before: Andrew J. Kleinfeld, M. Margaret McKeown and
Raymond C. Fisher, Circuit Judges.

Per Curiam Opinion

---

*The panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

2017

## COUNSEL

David A. Senior, McBreen & Senior, Los Angeles, California; John R. Grele, San Francisco, California; Richard P. Steinken, Janice H. Lam and Stephanie L. Reinhart, Jenner & Block, LLP, Chicago, Illinois; Ginger D. Anders, Jenner & Block, LLP, Washington D.C., for the plaintiff-appellant.

Bill Lockyer, Attorney General of the State of California, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Ronald S. Matthias, Supervising Deputy Attorney General, and Dane R.

Gillette, Senior Assistant Attorney General, San Francisco, California, for the defendants-appellees.

---

**OPINION**

PER CURIAM:

Michael Angelo Morales ("Morales") is a California death row inmate scheduled to be executed by lethal injection on February 21, 2006 at 12:01 a.m. He brought a 42 U.S.C. § 1983 action in the United States District Court seeking to enjoin the State from executing him by lethal injection under the procedures set forth in San Quentin Operational Procedure No. 770 ("Protocol No. 770"). Specifically, Morales contended that a combination of circumstances, including the specific drugs chosen, the procedure by which the drugs are administered and the absence of medically trained personnel overseeing the execution, creates a foreseeable and undue risk that he will experience unnecessary and wanton pain constituting cruel and unusual punishment under the Eighth and Fourteenth Amendments. *See Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (holding that the Eighth Amendment prohibits punishments that "involve the unnecessary and wanton infliction of pain.").

After reviewing evidence Morales presented regarding the circumstances of the 13 lethal injection executions California has carried out to date under Protocol No. 770, the district court found that Morales "raised . . . substantial questions" about the implementation of Protocol No. 770, District Court Order of Feb. 14 at 12 ("Order 1"), including whether the State's administration of Protocol No. 770 "creates an undue risk that [Morales] will suffer excessive pain when he is executed," Order 1 at 13, and "whether a person rendered unconscious by sodium thiopental might regain consciousness during administration of pancuronium bromide or potassium

chloride." Order 1 at 14. Responding to these concerns, and applying the standard for a stay of execution we articulated in *Beardslee v. Woodford*, 395 F.3d 1064, 1067-68 (9th Cir. 2005),[1] the district court conditioned its denial of Morales' request for a stay of execution on the State's compliance with certain amendments to Protocol No. 770. The court proposed two alternative conditions to address the risk of an unconstitutionally cruel and painful execution.[2] The State agreed to comply with the court's second alternative condition — having a qualified anesthesiologist present to ensure that Morales is indeed unconscious during the second and third stages of the lethal injection process — and the court issued a final order permitting the execution to proceed as scheduled. Morales now appeals the court's two orders (which we will refer to collectively as the "Orders"). We review for an abuse of discretion, *Beardslee*, 395 F.3d at 1068, and affirm subject to the interpretation of the Orders as set forth in this opinion.

## I.

Morales was tried for the rape and murder of Terri Winchell, a seventeen-year old girl. A jury convicted Morales of murder, found special circumstances and sentenced him to death. After the California Supreme Court affirmed his conviction, and the United States Supreme Court denied certiorari, Morales' conviction became final in 1989. Morales

---

[1]"[B]efore granting a stay of execution, courts 'must consider not only the likelihood of success on the merits and the relative harms to the parties, but also the extent to which the inmate has delayed unnecessarily in bringing the claim.' " *Beardslee*, 395 F.3d at 1068 (quoting *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004)).

[2]The court's two alternative conditions were: (1) the State would "use only sodium thiopental or another barbiturate or combination of barbiturates in [Morales'] execution," thereby avoiding the concern that one of the other two drugs would cause Morales pain; (2) the State would agree to allow an anesthesiologist to monitor and verify that Morales is and remains unconscious throughout the execution procedure. Order 1 at 13-14.

unsuccessfully sought habeas review in both the federal district court and this court. The Supreme Court again denied certiorari after we refused to grant Morales habeas relief. *See generally Morales v. Woodford*, 388 F.3d 1159, 1163-1167 (9th Cir. 2004), *cert. denied*, ___ U.S. ___, 126 S.Ct. 420 (2005) (describing in detail the crime, the trial and the case's procedural history). In addition to his § 1983 claim, Morales again seeks post-conviction relief through an application to file a second or successive habeas petition. *See* 28 U.S.C. § 2244(b). We address that application in a separate order. *See Morales v. Hickman*, ___ (9th Cir. 2006). Here we address only Morales' § 1983 appeal.

## II.

To understand the basis of Morales' claim, we must first describe in some detail the actual implementation of Protocol No. 770, both in its original form and as modified by the district court. After the condemned is placed in the execution chamber, "[a] person qualified . . . or otherwise authorized by law" inserts two intravenous lines into the inmate's veins.[3] After saline begins flowing through one of the IV lines, all "injection team members vacate the chamber," seal the door and leave the condemned alone in the room. At this point, the warden orally commands the commencement of the execution. The injection team members, positioned outside the execution chamber, begin administering the lethal drug cocktail through the extended IV lines.

First, the condemned receives five grams of sodium thiopental (also known as sodium pentothal), which, if administered properly, will render him unconscious and therefore insensible to pain.[4] Next, the injection team administers 100

---

[3]The second IV line is to "be held in reserve as a contingency line in case of a malfunction or blockage in the first line."

[4]Protocol No. 770 lists, as part of the "chemicals needed for execution," two five-gram doses of sodium thiopental. However, the text of Protocol

milligrams of pancuronium bromide (also known as Pavulon), paralyzing the inmate's voluntary muscles. Finally, 100 milligrams of potassium chloride are injected, resulting in cardiac arrest and death.[5] A physician is on hand to pronounce the time of death.

There is no dispute that in the absence of a properly administered anesthetic, Morales would experience the sensation of suffocation as a result of the pancuronium bromide and excruciating pain from the potassium chloride activating nerve endings in Morales' veins. *See* Order 1 at 3; *see also Beardslee*, 395 F.3d at 1071, 1074. Both parties further agree that if the sodium thiopental is properly administered, virtually all persons would be unconscious within 60 seconds and would not experience these sensations. Order 1 at 8.

Before the district court, Morales challenged the assumption that the sodium thiopental will be properly administered. He claimed that there exists a very real and foreseeable risk that he will be conscious and fully experience the effects of the second two drugs. Among his contentions are that (1) the sodium thiopental will not have its desired effect because it is being administered and monitored by unqualified individuals; (2) the paralytic drug will prevent him from communicating his conscious state and distress; (3) no officials remain in the execution room to ensure that he is indeed unconscious and remains so until death; and (4) Protocol No. 770 does not ade-

No. 770 provides that only one five-gram dose is prepared in anticipation of the execution, while the other remains "unopened" and therefore, perhaps not immediately administrable should something go wrong with the first five-gram dose. Notably, the State claims that Protocol No. 770 has been modified in practice to provide for the preparation of "an extra syringe containing 1.25 grams [of sodium thiopental] . . . as a backup." State's § 1983 Response Brief at 6 ("Response Brief").

[5]Three syringes containing 50 milligrams of pancuronium bromide and three syringes containing 50 milligrams of potassium chloride are prepared, "even though the injection procedure only calls for two of each. The extra syringes are to be prepared as 'stand-bys.'"

quately account for other foreseeable contingencies that could produce unnecessary suffering.

The district court's February 14 order found that Morales "raised . . . substantial questions" about Protocol No. 770, as implemented. Order 1 at 12. Relying on a detailed review of California's execution logs that suggest "that the inmates' breathing may not have ceased as expected in at least six out of 13 executions by lethal injection," the court found that there exists "at least some doubt as to whether the protocol actually is functioning as intended." Order 1 at 11. The district court accepted the State's expert testimony that, when properly administered, the five gram dose of sodium thiopental "should both stop breathing and cause unconsciousness within a minute." Order 1 at 11. Nonetheless, it concluded that "evidence from eyewitnesses tending to show that many inmates continue to breathe long after they should have ceased to do so cannot simply be disregarded on its face." Order 1 at 11. These findings of fact led the district court to impose its two alternate conditions on Protocol No. 770 to preserve what the district court characterized as Morales' "constitutional right not to be subject to an undue risk of extreme pain." Order 1 at 12.

Upon the State's acceptance of the anesthesiologist option, the district court in its February 16, 2006 final order modified Protocol No. 770 to ensure the presence of a medically qualified anesthesiologist during the execution procedure. (The State has agreed to have two anesthesiologists on hand, one inside the execution chamber and one in reserve.) In all other respects, Protocol No. 770 remains unchanged. District Court Order of Feb. 16 at 4 n.3, ("Order 2") (citing Slavin declaration).

## III.

The issue presented in this case is a narrow one. Morales does not challenge the constitutionality of the death penalty in

general nor even the constitutionality of lethal injections in particular. His only claim is that Protocol No. 770 as currently implemented in California, and as modified by the district court, violates the Eighth and Fourteenth Amendments. However, we need not decide this broad issue, but need only determine whether the district court's modification of Protocol No. 770 was an abuse of discretion in light of the court's findings of fact.[6]

"The district court abuses its discretion when its equitable decision is based on an error of law or a clearly erroneous factual finding." *United States v. Washington*, 157 F.3d 630, 642 (9th Cir. 1998). "An abuse of discretion is a plain error, discretion exercised to an end not justified by the evidence, a judgment that is clearly against the logic and effect of the facts as are found." *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir. 1993) (internal quotations and citation omitted).

[1] Challenges to Protocol No. 770 have recently come before us, and in both cases we rejected the inmates' assertions that the district court abused its discretion in upholding the Protocol. *See Beardslee*, 395 F.3d at 1076; *Cooper v. Rimmer*, 379 F.3d 1029, 1033 (9th Cir. 2004). In *Cooper*, we declined a stay of execution in large part because Cooper raised his Eighth Amendment claim "at the eleventh hour," and moreover "Cooper [fell] short of showing that he is subject to an unnecessary risk of unconstitutional pain or suffering such that his execution by lethal injection under California's protocol must be restrained." *Cooper*, 379 F.3d at

---

[6]The State has not appealed the district court's findings of fact or the district court's imposition of conditions on the implementation of Protocol No. 770. The State does continue to argue that not all the evidence the district court considered troubling suggests consciousness. For example, the State asserts that "[a]lthough chest wall movement may be observed after delivery of thiopental, such movement is not associated with breathing, nor is it reflective of the subject's state of consciousness." Response Brief at 8.

1031, 1033. But as the district court found in this case, Morales' diligence allowed the court to more thoroughly consider the relevant legal and factual issues that ultimately bore on its conclusion. Order 1 at 6.

**[2]** In *Beardslee*, we held that although Beardslee had acted "promptly," 395 F.3d at 1069, we could not, given our deferential standard of review and based on the "limited record" in that case, conclude that the district court had abused its discretion in denying a stay of execution. 395 F.3d at 1076. Nonetheless, we acknowledged that Beardslee's limited evidence for the potential of his being conscious during his execution "raises extremely troubling questions about the protocol." *Id.* at 1075. In contrast, as the district court found, Morales "raise[s] more substantial questions than his counterparts in *Cooper* and *Beardslee*." Order 1 at 12. Unlike the earlier challenges to Protocol No. 770, in this case the district court had a more developed record, including evidence from executions subsequent to and including Beardslee's. Based on that record, the district court has, in *Beardslee*'s terms, found that Morales has "shown sufficient likelihood that the administration [of the sodium thiopental] will be improper in his case, or that there are specific risks unique to him that require modification of the protocol." *Beardslee*, 395 F.3d at 1076.

## IV.

The district court's modification of Protocol No. 770, relying in large part on the testimony of Morales' own expert, attempted to accommodate Morales' objections and cure the perceived constitutional infirmities. The district court exercised its equitable powers to "preserve[ ] both the State's interest in proceeding with [Morales'] execution and [Morales'] constitutional right not to be subject to an undue risk of extreme pain." Order 1 at 12. Morales continues, however, to express concern that the precise nature and scope of the anesthesiologists' role in the execution is uncertain, and the modifications are therefore deficient. Specifically, Morales claims

that the State has "made no commitment as to how the new procedure will work and what the anesthesiologist [present in the execution chamber] will do, other than to monitor Mr. Morales' level of unconsciousness." Morales § 1983 Opening Brief at 20 ("Opening Brief"). Further, Morales asserts that the anesthesiologists' role is limited and therefore they "will not be able meaningfully to ensure that the execution is performed humanely." Opening Brief at 21. Essentially, we consider Morales' principal challenge to the amended protocol to be: "[t]he presence of the monitor will serve no purpose if the doctor is powerless to act on, or cause the injection team to act on, his awareness that Mr. Morales is in fact conscious and in pain." Opening Brief at 21.

[3] The district court's Orders adequately address Morales' concerns. The Orders provide specifically that an anesthesiologist will "independent[ly] verif[y], through direct observation and examination . . . , in a manner comparable to that normally used in medical settings where a combination of sedative and paralytic medications is administered, that [Morales] in fact is unconscious before either pancuronium bromide or potassium chloride is injected." Order 1 at 14. Further,

> at least one of the anesthesiologists [shall] be present in the execution chamber and . . . the anesthesiologists' duties [shall] be performed in accordance with current professional medical standards. In particular, the anesthesiologists may use and would be expected to use whatever monitoring equipment a board-certified anesthesiologist would deem necessary to ensure that a patient to whom a combination of a barbiturate and a paralytic have been administered is fully unconscious at all times following the administration of sodium thiopental.

Order 2 at 4.

**[4]** In addressing Morales' concerns about the scope of the anesthesiologists' monitoring role, the court explicitly clarified that the anesthesiologists will "take all medically appropriate steps necessary to ensure that [Morales] *is and remains unconscious*," Order 2 at 4, n.3 (emphasis added), meaning that he must be unconscious before *and* after he is injected with pancuronium bromide or potassium chloride. Thus if the anesthesiologists are unable to ensure that Morales "is [or] remains unconscious," we construe the order as clearly contemplating that they have the authority to take "all medically appropriate steps" — either alone or in conjunction with the injection team — to immediately place or return Morales into an unconscious state or to otherwise alleviate the painful effects of either or both the pancuronium bromide or potassium chloride. We also construe the "take all medically appropriate steps" language to require that the anesthesiologists have available the medical supplies and medications a board-certified anesthesiologist would deem necessary to carry out his or her responsibilities to "ensure" Morales is and remains unconscious.

**[5]** The district court did not abuse its discretion in fashioning a remedy that would alleviate the substantial concerns it found with the way Protocol No. 770 was being implemented. In light of the district court's thorough response to Morales' objections and our understanding of the district court's Orders, Morales' appeal from the district court's denial of injunctive relief is denied.

**PETITION FOR STAY OF EXECUTION DENIED.**