Justice Alito,
concurring.
I join the plurality opinion but write separately to explain my view of how the holding should be implemented. The opinion concludes that “a State’s refusal to change its method [of execution] can be viewed as ‘cruel and unusual’ under the Eighth Amendment” if the State, “without a legitimate penological justification,” rejects an alternative method that is “feasible” and “readily” available and that would “significantly reduce a substantial risk of severe pain.” Ante, at 52. Properly understood, this standard will not, as Justice Thomas predicts, lead to litigation that enables “those seeking to abolish the death penalty ... to embroil the States in never-ending litigation concerning the adequacy of their execution procedures.” Post, at 105 (opinion concurring in judgment).
I
As the plurality opinion notes, the constitutionality of capital punishment is not before us in this case, and therefore we proceed on the assumption that the death penalty is constitutional. Ante, at 47. From that assumption, it follows that there must be a constitutional means of carrying out a death sentence.
We also proceed in this case on the assumption that lethal injection is a constitutional means of execution. See Gregg v. Georgia, 428 U. S. 153,175 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (“[I]n assessing a punishment selected by a democratically elected legislature against the *64 constitutional measure, we presume its validity”). Lethal injection was adopted by the Federal Government and 36 States because it was thought to be the most humane method of execution, and petitioners here do not contend that lethal injection should be abandoned in favor of any of the methods that it replaced — execution by electric chair, the gas chamber, hanging, or a firing squad. Since we assume for present purposes that lethal injection is constitutional, the use of that method by the Federal Government and the States must not be blocked by procedural requirements that cannot practicably be satisfied.
Prominent among the practical constraints that must be taken into account in considering the feasibility and availability of any suggested modification of a lethal injection protocol are the ethical restrictions applicable to medical professionals. The first step in the lethal injection protocols currently in use is the anesthetization of the prisoner. If this step is carried out properly, it is agreed, the prisoner will not experience pain during the remainder of the procedure. Every day, general anesthetics are administered to surgical patients in this country, and if the medical professionals who participate in these surgeries also participated in the anesthetization of prisoners facing execution by lethal injection, the risk of pain would be minimized. But the ethics rules of medical professionals — for reasons that I certainly do not question here — prohibit their participation in executions.
Guidelines issued by the American Medical Association (AMA) state that “[a]n individual’s opinion on capital punishment is the personal moral decision of the individual,” but that “[a] physician, as a member of a profession dedicated to preserving life when there is hope of doing so, should not be a participant in a legally authorized execution.” AMA, Code of Medical Ethics, Policy E-2.06 Capital Punishment (2000), online at http://www.ama-assn.org/amal/pub/upload/ mm/369/e206capitalpunish.pdf (all Internet materials as vis *65 ited Apr. 14,2008, and available in Clerk of Court’s case file). The guidelines explain:
“Physician participation in an execution includes, but is not limited to, the following actions: prescribing or administering tranquilizers and other psychotropic agents and medications that are part of the execution procedure; monitoring vital signs on site or remotely (including monitoring electrocardiograms); attending or observing an execution as a physician; and rendering of technical advice regarding execution.” Ibid.
The head of ethics at the AMA has reportedly opined that “[e]ven helping to design a more humane protocol would disregard the AMA code.” Marris, Will Medics’ Qualms Kill the Death Penalty? 441 Nature 8-9 (May 4, 2006).
The American Nurses Association (ANA) takes the position that participation in an execution “is a breach of the ethical traditions of nursing, and the Code for Nurses.” ANA, Position Statement: Nurses’ Participation in Capital Punishment (1994), online at http://nursingworld.org/Main menu Categories / Health care and Policy Issues / ANAPosition Statements / EthicsandHumanRights.aspx. This means, the ANA explains, that a nurse must not “take part in assessment, supervision or monitoring of the procedure or the prisoner; procuring, prescribing or preparing medications or solutions; inserting the intravenous catheter; injecting the lethal solution; and attending or witnessing the execution as a nurse.” Ibid.
The National Association of Emergency Medical Technicians (NAEMT) holds that “[participation in capital punishment is inconsistent with the ethical precepts and goals of the [Emergency Medical Services] profession.” NAEMT, Position Statement on EMT and Paramedic Participation in Capital Punishment (June 9, 2006), online at http:// www.naemt.org/aboutNAEMT/capitalpunishment.htm. The NAEMT’s Position Statement advises that emergency medi *66 cal technicians and paramedics should refrain from the same activities outlined in the ANA statement. Ibid.
Recent litigation in California has demonstrated the effect of such ethics rules. Michael Morales, who was convicted and sentenced to death for a 1981 murder, filed a federal civil rights action challenging California’s lethal injection protocol, which, like Kentucky’s, calls for the sequential administration of three drugs: sodium pentothal, pancuronium bromide, and potassium chloride. The District Court enjoined the State from proceeding with the execution unless it either (1) used only sodium pentothal or another barbiturate or (2) ensured that an anesthesiologist was present to ensure that Morales remained unconscious throughout the process. Morales v. Hickman, 415 F. Supp. 2d 1037, 1047 (ND Cal. 2006). The Ninth Circuit affirmed the District Court’s order, Morales v. Hickman, 438 F. 3d 926, 931 (2006), and the State arranged for two anesthesiologists to be present for the execution. However, they subsequently concluded that “they could not proceed for reasons of medical ethics,” Morales v. Tilton, 465 F. Supp. 2d 972, 976 (ND Cal. 2006), and neither Morales nor any other prisoner in California has since been executed, see Denno, The Lethal Injection Quandary: How Medicine Has Dismantled the Death Penalty, 76 Ford. L. Rev. 49 (2007).
Objections to features of a lethal injection protocol must be considered against the backdrop of the ethics rules of medical professionals and related practical constraints. Assuming, as previously discussed, that lethal injection is not unconstitutional per se, it follows that a suggested modification of a lethal injection protocol cannot be regarded as “feasible” or “readily” available if the modification would require participation — either in carrying out the execution or in training those who carry out the execution — by persons whose professional ethics rules or traditions impede their participation.
*67 II
In order to show that a modification of a lethal injection protocol is required by the Eighth Amendment, a prisoner must demonstrate that the modification would “significantly reduce a substantial risk of severe pain.” Ante, at 52 (emphasis added). Showing merely that a modification would result in some reduction in risk is insufficient. Moreover, an inmate should be required to do more than simply offer the testimony of a few experts or a few studies. Instead, an inmate challenging a method of execution should point to a well-established scientific consensus. Only if a State refused to change its method in the face of such evidence would the State’s conduct be comparable to circumstances that the Court has previously held to be in violation of the Eighth Amendment. See Farmer v. Brennan, 511 U. S. 825, 886 (1994).
The present case well illustrates the need for this type of evidence. Although there has been a proliferation of litigation challenging current lethal injection protocols, evidence regarding alleged defects in these protocols and the supposed advantages of alternatives is strikingly haphazard and unreliable. As The Chief Justice and Justice Breyer both note, the much-discussed Lancet article, Koniaris, Zimmers, Lubarsky, & Sheldon, Inadequate Anaesthesia in Lethal Injection for Execution, 365 Lancet 1412 (Apr. 2005), that prompted criticism of the three-drug protocol has now been questioned, see Groner, Inadequate Anaesthesia in Lethal Injection for Execution, 366 Lancet 1073 (Sept. 2005). And the lack of clear guidance in the currently available scientific literature is dramatically illustrated by the conclusions reached by petitioners and by Justice Stevens regarding what they view as superior alternatives to the three-drug protocol.
Petitioners’ chief argument is that Kentucky’s procedure violates the Eighth Amendment because it does not employ *68 a one-drug protocol involving a lethal dose of an anesthetic. By “relying... on a lethal dose of an anesthetic,” petitioners contend, Kentucky “would virtually eliminate the risk of pain.” Brief for Petitioners 51. Petitioners point to expert testimony in the trial court that “a three-gram dose of thiopental would cause death within three minutes to fifteen minutes.” Id., at 54, n. 16.
The accuracy of that testimony is not universally accepted. Indeed, the medical authorities in the Netherlands, where assisted suicide is legal, have recommended against the use of a lethal dose of a barbiturate. An amicus supporting petitioners, Dr. Robert D. Truog, Professor of Medical Ethics and Anesthesiology at Harvard Medical School, has made the following comments about the use of a lethal dose of a barbiturate:
“A number of experts have said that 2 or 3 or 5 g[rams] of pentothal is absolutely going to be lethal. The fact is that, at least in this country, none of us have any experience with this.. ..
“If we go to Holland, where euthanasia is legal, and [we] look at a study from 2000 of 535 cases of euthanasia, in 69% of those cases, they used a paralytic agent. Now, what do they know that we haven’t figured out yet? I think what they know is that it’s actually very difficult to kill someone with just a big dose of a barbiturate. And, in fact, they report that in 6% of those cases, there were problems with completion. And in I think five of those, the person actually woke up, came back out of coma.” Perspective Roundtable: Physicians and Execution — Highlights from a Discussion of Lethal Injection, 358 New England J. Med. 448 (2008).
Justice Stevens does not advocate a one-drug protocol but argues that “States wishing to decrease the risk that future litigation will delay executions or invalidate their protocols would do well to reconsider their continued use of *69 pancuronium bromide” in the second step of the three-drug protocol.* Post, at 77 (opinion concurring in judgment). But this very drug, pancuronium bromide, is recommended by the Royal Dutch Society for the Advancement of Pharmacy as the second of the two drugs to be used in cases of euthanasia. See Kimsma, Euthanasia and Euthanizing Drugs in The Netherlands, reprinted in Drug Use in Assisted Suicide and Euthanasia 193, 200, 204 (M. Battin & A. Lipman eds. 1996).
My point in citing the Dutch study is not that a multidrug protocol is in fact better than a one-drug protocol or that it is advisable to use pancuronium bromide. Rather, my point is that public policy on the death penalty, an issue that stirs deep emotions, cannot be dictated by the testimony of an expert or two or by judicial findings of fact based on such testimony.
Ill
The seemingly endless proceedings that have characterized capital litigation during the years following Gregg are well documented. In 1989, the Report of the Judicial Conference’s Ad Hoc Committee on Federal Habeas Corpus in Capital Cases, chaired by Justice Powell, noted the lengthy delays produced by collateral litigation in death penalty cases. See Committee Report and Proposal 2-4. The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) was designed to address this problem. See, e. g., Woodford v. Garceau, 538 U. S. 202, 206 (2003) (“Congress enacted AEDPA to reduce delays in the execution of *70 state and federal criminal sentences, particularly in capital cases ...” (citing Williams v. Taylor, 529 U. S. 362, 386 (2000) (opinion of Stevens, J.))); H. R. Rep. No. 104-23, p. 8 (1995) (stating that AEDPA was “designed to curb the abuse of the habeas corpus process, and particularly to address the problem of delay and repetitive litigation in capital cases”).
Misinterpretation of the standard set out in the plurality opinion or adoption of the standard favored by the dissent and Justice Breyer would create a grave danger of extended delay. The dissenters and Justice Breyer would hold that the protocol used in carrying out an execution by lethal injection violates the Eighth Amendment if it creates an “untoward, readily avoidable risk of inflicting severe and unnecessary pain.” See post, at 123 (Ginsburg, J., dissenting) (emphasis added); post, at 107 (Breyer, J., concurring in judgment). Determining whether a risk is “untoward,” we are told, requires a weighing of three factors — the severity of the pain that may occur, the likelihood of this pain, and the availability of alternative methods. Post, at 116 (Ginsburg, J., dissenting). We are further informed that “[t]he three factors are interrelated; a strong showing on one reduces the importance of the others.” Ibid.
An “untoward” risk is presumably a risk that is “unfortunate” or “marked by or causing trouble or unhappiness.” Webster’s Third New International Dictionary 2513 (1971); Random House Dictionary of the English Language 1567 (1967). This vague and malleable standard would open the gates for a flood of litigation that would go a long way toward bringing about the end of the death penalty as a practical matter. While I certainly do not suggest that this is the intent of the Justices who favor this test, the likely consequences are predictable.
The issue presented in this case — the constitutionality of a method of execution — should be kept separate from the controversial issue of the death penalty itself. If the Court wishes to reexamine the latter issue, it should do so directly, *71 as Justice Stevens now suggests. Post, at 81. The Court should not produce a de facto ban on capital punishment by adopting method-of-execution rules that lead to litigation gridlock.

In making this recommendation, he states that “[t]here is a general understanding among veterinarians that the risk of pain is sufficiently serious that the use of [this] drug should be proscribed when an animal’s life is being terminated.” Post, at 71. But the American Veterinary Medical Association (AVMA) guidelines take pains to point out that they should not be interpreted as commenting on the execution of humans by lethal injection. AVMA, Guidelines on Euthanasia (June 2007), online at http://avma.org/issues/animal_welfare/euthanasia.pdf.